**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CYNTHIA JONES, as natural mother
and guardian of B.L., a minor,

          Plaintiff,

vs.                                                   Case No. 3:05-cv-1163-J-32HTS

UNITED STATES OF AMERICA,

          Defendant.

_____

**<u>ORDER</u>**[1]

    This medical malpractice action, brought pursuant to the Federal Tort Claims

Act, is currently before the Court on Plaintiff's Motion For Partial Summary Judgment

(Doc. 20) and defendant United States' Dispositive Motion For Summary Judgment.

(Doc. 27.) The parties have responded to the motions, (Docs. 27, 28-1, 35), and

presented argument of counsel at a hearing held on July 19, 2007 (Doc. 32), the

record of which is incorporated.

**I.**    **<u>Background</u>**

    Plaintiff Cynthia Jones ("Jones"), who brings this claim as natural mother and

guardian of her son B.L., a minor, is a carrier of the Hepatitis B virus. She alleges that

_____

    [1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it is intended to decide the motions addressed herein and is not intended for official publication or to serve as precedent.

pediatrician Dr. Sujith Kalmadi, a federal employee who attended to her newborn son B.L. after the infant's birth on November 21, 2001, was negligent when he failed to have B.L. inoculated with Hepatitis B immune globulin and the Hepatitis B vaccine immediately after B.L.'s birth, which resulted in B.L.'s contracting vertically acquired Hepatitis B.[2] The defendant contends that plaintiff failed to file a timely administrative claim with the United States Department of Health and Human Services ("Department"), as required by the Federal Tort Claims Act ("FTCA").

Under the FTCA, a tort claim against the United States must be presented in writing to the appropriate federal agency within two years after the claim accrues, or it is time barred. 28 U.S.C. § 2401(b). In this case, the parties agree that Jones' FTCA claim is untimely if it accrued prior to January 26, 2003, which is the two-year mark prior to the date Jones' claim was presented to the Department. (Docs. 20 at 6; 25-4 ¶¶ 11; 27 at 1.) The jurisdictional issue in this case is a statute of limitations

---

[2]    The Hepatitis B immunization series is recommended for all infants within the first six months of life, the first dose beginning at the age of two months. There are three Hepatitis B immunizations in this series. Infants that are exposed to Hepatitis B during pregnancy, however, are recommended to receive the Hepatitis B immune globulin and the Hepatitis B vaccine (first dose) within 12 hours of birth to combat the baby's contracting the Hepatitis B virus from its mother; proper administration of the vaccine significantly reduces the risk of the baby being infected by the Hepatitis B virus. Symptoms from Hepatitis B may remain dormant for years, but the infection may eventually develop into chronic inflammation of the liver and cirrhosis. (See Doc. 25-12 ¶ 9.)

question - whether the plaintiff timely filed her administrative claim under the FTCA.[3]

## II.  **FACTS**

Plaintiff Jones occasionally visited the Family Medical and Dental Centers ("FMDC") in Palatka, Florida, for her medical care.  It is undisputed that  FMDC is a federally supported health center and has been since 1997, and that the FTCA is the exclusive remedy available for injuries caused by employees of the FMDC.  (See Doc. 25-4 ¶¶ 3, 16.)[4]  Jones had discussed with her physician at FMDC that she was a Hepatitis B carrier.

In April, 2001, a pregnancy test revealed that Jones was pregnant, and FMDC referred her to Dr. Mohamed M. Akhiyat, a private obstetrician/gynecologist, for her prenatal care.  On May 16, 2001, FMDC notified Dr. Akhiyat in writing that Jones has Hepatitis B, and that "upon delivery, her baby will need 0.5 m of Hep. B

_____

[3]  Plaintiff's motion for partial summary judgment is directed to defendant's thirteenth affirmative defense which alleges plaintiff's claim is barred by the FTCA statute of limitations, 28 U.S.C. § 2401(b).  Defendant characterizes its motion for summary judgment on the same issue as dispositive.  The question of whether Plaintiff's claim is time-barred goes to the jurisdiction of this Court to hear this case, and thus may have been brought pursuant to Fed. R. Civ. P. 12(b)(1) as a challenge to subject matter jurisdiction.  See Slater v. United States, 175 Fed. Appx. 300, 303 (11th Cir. 2006); Burgess v. United States, 744 F.2d 771, 773 (11th Cir. 1984).

[4]  See The Federally Supported Health Centers Assistance Act of 1992, Public Law No. 102-501, 42 U.S.C. § 233, and the amended Federally Supported Health Centers Assistance Act of 1995, Public Law 104-73, 42 U.S.C. § 201 (Doc. 25-4 ¶ 3); see also e.g. Ingram v. United States (In re T.L.), 443 F.3d 956, 958-59 (8th Cir. 2006); Motley v. United States, 295 F.3d 820, 823 n.2 (8th Cir. 2002); Gonzalez v. United States, 284 F.3d 281, 286 (1st Cir. 2002)

Immunoglobulin and Hep. B vaccine." Jones states that she discussed with Dr. Akhiyat that the birth would be by Cesarean section, and that the baby would receive shots upon his birth.  (Docs. 20-2 at 4-6, 9; 25-15 at 20.)

On November 21, 2001, Jones gave birth to B.L. by ceasarian section, performed by Dr. Akhiyat, at the Putnam Community Medical Center ("PCMC"). Pediatrician Dr. Kalmadi treated and observed B.L. at the time of B.L.'s birth until he was discharged from PCMC.  On that date, Dr. Kalmadi was an employee of FMDC and attending pediatrician on call at PCMC.  (Docs. 25-4 ¶ 4, 25-13 at ¶ 2.)  Though Jones has no recollection of seeing or speaking with Dr. Kalmadi at the hospital, Dr. Kalmadi states that he spoke directly with Jones on at least two occasions prior to her discharge regarding routine matters of newborn child care and B.L.'s health, and that he identified himself as a pediatrician from FMDC.  He states he instructed Jones to follow up her pediatric care for B.L. with Dr. Kamalasani Panchamirtham ("Dr. Panch") at FMDC.  Dr. Panch is the pediatrician for Jones' other children.[5]  (Docs. 20-2 at 6-8; 25-13 ¶ 3; 25-7 at 34; 25-9 at 3-4.)

Jones and B.L. were discharged from the hospital on November 23, 2001.

---

[5]    Jones has had five other children, though one son died as an infant in 1992 from Sudden Infant Death Syndrome (SIDS).  She discovered in 1991 she was a carrier of the Hepatitis B virus after the birth of her second child, after which all of her newborn babies were vaccinated at birth except B.L.  The other children did not contract Hepatitis B.  Jones completed the eighth grade, and subsequently completed her GED.  (Docs. 20-2 at 19; 25-5 at 5-7, 16, 18-22; 25-6 at 3; 25-7 at 13, 37; 25-8 at 1; 25-14 at 65.)

4

Jones recalled being told by one of the nurses that B.L. would be receiving his shots for Hepatitis B on the date of discharge.  However, B.L. did not receive any Hepatitis B innoculation prior to his discharge from PCMC on November 23, 2001.  (Doc. 20-2 at 10.)

The medical records from PCMC for November 21-23, 2001 identify Dr. Kalmadi as an attending physician (the name is repeatedly stamped on the records) (Doc. 25-13 at 3-11, 13, 17, 19, 20, 22, 24, 27-29).  The handwritten initials "FMDC", which Dr. Kalmadi states is his notation, appear three times in the records, twice on the PCMC Newborn Record and again on the Physician's Progress Notes.  (Doc. 25-13 at  4, 24.)

B.L. was seen by FMDC pediatrician Dr. Panch for routine follow-up "well child" visits on November 27 and December 18, 2001.  (Doc. 25-12 ¶ 8.)

On January 2, 2002, Susan Lane, an employee of the Putnam County Health Department ("health department") infectious disease program, phoned the PCMC to follow up on B.L.'s Hepatitis B vaccination timeline.  Upon a review of B.L.'s medical records, PCMC discovered "'there is nothing in this chart that shows any vaccine was given within 12 hours of birth.'"  Lane then called FMDC, whose immunization nurse confirmed that no immunization record for B.L. had been established.  Lane telephoned Jones, who "seemed very concerned about the situation," and advised that the "infant needs to begin Hep B series ASAP."  Lane arranged to transport

5

Jones and infant B.L. the following morning at 8:15 a.m. to the health department for B.L.'s immunization.  Lane recorded that Jones stated: "'They (PCMC) should have known to give that to my baby.  I had all my other ones there too.  I should have reminded them.  I was out of it.'" Jones did not recall  Dr.Kalmadi at that time.  (Docs. 20-2 at 10; 25-5 at 26-29; 25-14 at 12.)

Dr. Panch, B.L.'s pediatrician at FMDC, was informed on January 3, 2002 that B.L. did not receive any Hepatitis B vaccine at birth, even though his mother was a Hepatitis B carrier.  Also on that date, health department infectious disease nurse Donna McCullough, noted that she

> Spoke with Dr. Kalmadi, one of four doctors that was involved in client's and baby's care.  He expressed concern and wanted to be sure that baby was started on vaccinations.  Dr. Kalmadi was favorably impressed that health department had followed up on this case and that it did not go any further without vaccination.  Dr. Kalmadi stated that physicians do not usually see mother's chart and therefore are not aware of hepatitis status.

(Doc. 20-2 at 11.)  B.L. received his first in the series of Hepatitis B vaccinations on January 3, 2002.  (Doc. 25-12 ¶ 9.)

On January 7, 2002, Jones and infant B.L. went to FMDC for lab work "due to the known Hepatitis B exposure."  "Because [B.L.] should have been given the Hepatitis B vaccination within hours after his birth, and the failure to do so caused [B.L.] to stand a higher chance of contracting the Hepatitis B virus, [Dr. Panch at FMDC] expressed concern about [B.L.'s] potential Hepatitis B condition and advised

the mother that additional vaccinations and lab tests would . . . need to be undertaken to determine with finality whether [B.L.] would in fact contract Hepatitis B, the same virus that the mother carried."   (Doc. 25-12 ¶ 10.)

According to Dr. Panch at FMDC, the January 16, 2002 laboratory results "revealed that [B.L.] was hepatitis B positive." (Doc. 25-12 ¶ 11 and at 14.[6]) Further, at B.L.'s two-month follow-up visit on February 5, 2002, Dr. Panch indicated on B.L.'s student health examination form that "[b]aby is positive for Hepatitis B."  On this date B.L. received his second Hepatitis B vaccination, followed by his third shot in the series on July 8, 2002.  (Doc. 25-12 ¶¶ 13, 14 and at 16.)  The records do not reflect that Jones was informed yet that B.L. tested "positive" for Hepatitis B.

Health department Healthy Start case worker Linda Wells stated that on May 30, 2002, Jones asked her for a referral to an attorney.  "She had decided that she wanted to pursue litigation against the hospital because of what had happened . . . [b]ecause that she felt that what had happened with Billy not getting the appropriate immunizations was wrong and that she wanted some help with legal issues regarding that."  Though at this juncture, Wells said that "we weren't even sure that [B.L.] was Hepatitis positive yet. . . . But Cynthia was concerned and she wanted to get legal advice and I thought that was appropriate." Wells had referred Jones to legal services

_____

[6]    The laboratory report states that "Hepatitis B surface antigen was confirmed as present" in B.L.'s blood at age six weeks.  (Doc. 25-12 at 14.)

in the past for assistance with domestic violence, housing and child support issues, and she referred Jones in this instance to the managing attorney at Central Florida Legal Services (now Community Legal Services of Mid Florida) who in turn could refer Jones to an attorney for this matter.  (Docs. 25-14 at 18-23; 25-15 at 22.)

On August 20, 2002, B.L. had a routine 9-month check-up with Dr. Panch.  At that time, blood was also drawn for a Hepatitis B panel to check whether the infant was Hepatitis B positive.  According to Dr. Panch, "[a]lthough previous lab work results showed that [B.L.] reacted positive to the Hepatitis B virus, the results of the 8/20/02 blood draw removed any doubt about the matter and confirmed that [B.L.] was indeed Hepatitis B positive and had actually contracted the virus."  (Doc. 25-12 ¶ 15 and at 24.)

Jones was informed on August 30, 2002 by FMDC pediatrician Dr. Panch that B.L. tested positive for Hepatitis B.  Jones called her health department case worker Wells to relay the news; Wells observed that Jones was upset.  However, health department infectious disease case worker Lane told both Jones and Wells that it was too soon to definitively determine the baby's Hepatitis B status; that the baby had to be closer to one-year old before a final determination could be made, and that additional blood tests would have to be done.  (Docs. 20-2 at 17; 25-5 at 34-35; 25-6 at 1; 25-14 at 27-29; 25-15 at 24.)

On August 31, 2002, Jones informed B.L.'s day care provider that B.L. was

Hepatitis B positive because it was a "safety issue" for her and the other children. The provider contacted the health department for instruction as to what precautions to take. (Docs. 25-5 at 35-36; 25-12 ¶ 16 and at 18.)

On September 3, 2002, Dr. Panch advised Jones that B.L. should be seen and followed by an infectious disease liver specialist, and advised of the possible consequences of Hepatitis B, "in light of his known contraction of the Hepatitis B virus." (Doc. 25-12 ¶ 17 and at 18.). However, on September 5, 2002, health department nurse McCollough and Lane called Jones' case worker Wells and told her that B.L. and Jones would have to be tested by the Center for Disease Control ("CDC") to confirm that the baby had contracted Hepatitis B. On September 6, Wells transported Jones to the health department for that purpose. (Docs. 25-14 at 33; 25-15 at 24.)

On October 2, 2002, health department employees reported to Jones the CDC test results showing that B.L. was Hepatitis B positive. Wells noted that Jones "had discussed the possibilities ever since the blood was drawn so she was prepared." (Docs. 20-2 at 18-19; 25-14 at 34-35, 25-15 at 26.)[7] Five days later, on October 7, 2002, Wells made a notation that Jones had mentioned to her mental health counselor that she was interested in obtaining an attorney from outside of Putnam

_____

[7]   Plaintiff concedes that on October 2, 2002, she was advised that B.L. tested positive for Hepatitis B. (Doc. 20 at 4.)

9

County.  (Doc. 25-14 at 40.)

On November 8, 2002, Jones asked case worker Wells again to refer her to an attorney concerning B.L.'s birth.  Wells again referred Jones to the legal services agency and Wells went to the agency and discussed the matter with managing attorney Mary Raspert.  On November 12, the legal services agency referred Jones to attorney Sidney Nowell ("Nowell") who met with Jones on November 21, 2002, B.L.'s first birthday.[8]  Jones said, "I just wanted some answers . . . Why this happened, who was at fault, and I just wanted answers." Nowell learned the history of the case from Jones, and asked Jones to obtain copies of medical records from the hospital, PCMC.[9]  (Docs. 25-6 at 11-12, 18-19; 25-14 at 41-45; 25-15 at 28.)

On December 18, 2002, Jones received a packet of papers to fill out from attorney Nowell and Jones asked her case worker Wells to transport her to the hospital to obtain the records.  On December 27, Jones told Wells that she needed to have the paperwork notarized.  Case worker notes reflect that Jones called PCMC on December 27, 2002 and requested copies of her medical records, and the hospital replied that it would call her back with the number of pages and cost of those records.

---

[8]    Case worker Wells attended the November 21, 2002 meeting between Nowell and Jones.  (Doc. 25-14 at 43.)

[9]    The record contains medical release forms signed by Jones dated March 7, 2002, September 3, 2003, December 4, 2003, October 6, 2004 and  November 22, 2004.  (Doc. 25-9 at 30-33, 38-40.)

(Docs. 20-2 at 20; 25-15 at 29-30 .)

On January 21, 2003, Jones obtained the medical records from PCMC, the hospital where B.L. was born.  With the help of her case worker Wells, Jones mailed the records to attorney Nowell.  The evidence is that the records were released by the hospital after a "couple of phone calls" and that the hospital never refused to release the records.  (Docs. 25-14 at 47, 49, 52-53; 25-15 at 33.)

Through the winter and spring of 2003, Jones did not hear from attorney Nowell and unsuccessfully tried to contact him.  (Doc. 25-14 at 55, 58; 25-16 at 2-5.)  On June 9, 2003, Nowell telephoned case worker Wells and reported he had someone "medical" reviewing the medical records, that he wished to contact health department worker Lane,  and that "things are progressing normally."  On September 2, 2003, Nowell telephoned case worker Wells and said he wanted to meet with Lane at the health department.  Wells reported the phone conversations to Jones.  (Doc. 25-16 at 5-6.)

On September 3, 2003, Jones signed another medical release form for Nowell because they could not find the earlier signed release, and Jones told Wells she was concerned with how long Nowell was taking with the case.  Jones said she wanted to talk with Nowell directly, and on September 3, 2003, Nowell returned Jones' phone call and set up an appointment to meet with her on September 8, 2003.  At that meeting, Nowell told Jones he was "ready to file [the] case."  (Docs. 25-14 at 60-63;

11

25-16 at 5-8, 10.)

The record is silent as to what happened during the next year.

On October 6, 2004, a notice of pre-suit pursuant to Sections 776.106 and 766.203, Florida Statutes, was sent to the hospital, PCMC, Dr. Kalmadi, and Dr. Akhiyat.  The notice was sent on behalf of Jones and her minor child B.L. by attorney Robert L. McLeod, Jones' current attorney in this case.  A similar pre-suit notice was sent to the FMDC on November 6, 2004.  (Doc. 25-4 at 16, 28.)

On November 1, 2004. Dr. Kalmadi responded from Ohio to the pre-suit notice with a letter to plaintiff's attorney McLeod, informing McLeod that during the time he provided services to B.L., he (Dr. Kalmadi) was employed by FMDC and was "covered by the Federal Torts Claims Act for medical malpractice."  Kalmadi stated that the delay in his responding was a result of the pre-suit notice being sent to the wrong address.  (Doc. 20-2.)  The United States Department of Health and Human Services responded on December 23, 2004 advising that FMDC is a Federally Supported Health Care center eligible for FTCA coverage, that Dr. Kalmadi was an employee of the center at the time of the incident and therefore covered by the FTCA, and that no administrative claim had yet been filed with the Department as required by 28 U.S.C. § 2675(a).  The Department enclosed a form and directions for filing a claim.  (Doc. 25-4 ¶ 10 and at 37-39.)

Jones filed an administrative claim with the Department on January 26, 2005

alleging that as a result of the negligence of Drs. Akhiyat and Kalmadi, and the PCMC, B.L. contracted Hepatitis B.  The claim was dated January 19, 2005.  On July 11, 2005, the Department denied the claim as time-barred under section 2401(b). (Doc. 25-4 ¶¶ 11, 12, 13 and at 39, 51.)[10]

## III.   Legal Standard

Challenges to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) can come in two forms, "facial" and "factual" attacks.

> Facial attacks challenge subject matter jurisdiction based on the allegations in the complaint, and the district court takes the allegations as true in deciding whether to grant the motion. . . . Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings. . . . In resolving a factual attack, the district court may consider extrinsic evidence such as testimony and affidavits.

Morrison v. Amway Corp., 323 F.3d 920, 924 n.5 (11th Cir. 2003)(citing Lawrence v. Dunbar, 919 F.2d 1525, 1528-29 (11th Cir. 1990)).  The Court considers this a factual attack because both parties proffer extrinsic evidence for the Court's consideration. "In the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists." OSI, Inc. v. United States, 285 F.3d 947, 951 (11th Cir. 2002)(citing Thomson v. Gaskill, 315 U.S. 442, 446 (1942)).  When a

_____

[10]    A state court action arising out of the same facts was filed May 5, 2005, and as of the date of hearing, remained pending.  Cynthia Jones v. Putnam Community Medical Center and Mohamed M. Akhyat, M.D., No. 05-240-CA/Div. No. 52 (Fla. Putnam County Cir. Ct.).  (See Doc. 27 at 3.)

defendant properly challenges subject matter jurisdiction under Rule 12(b)(1), the court may consider matters outside the pleadings and is free to weigh the evidence concerning jurisdiction so long as the issues do not implicate the merits of plaintiff's action.  See Morrison, 323 F.3d at 924-25.

## IV.    Federal Tort Claims Act

"The FTCA provides a limited waiver of the United States' sovereign immunity for tort claims." Dalrymple v. United States, 460 F.3d 1318, 1324 (11th Cir. 2006).  "It allows the government to be sued by certain parties under certain circumstances . . . ." Suarez v. United States, 22 F.3d 1064, 1065 (11th Cir. 1994).  However, "[a] federal court may not exercise jurisdiction over a suit under the FTCA unless the claimant first files an administrative claim with the appropriate agency" within two years from the time the claim accrues.  Id (citing 28 U.S.C. § 2675(a)) and 28 U.S.C. § 2401(b).  "[U]nder the FTCA the very right to sue evaporates after the expiration of the stated time." Maahs v. United States, 840 F.2d 863, 866 n.4 (11th Cir. 1988).  The two-year limitation period is a jurisdictional requisite to suit and is strictly construed. Magruder v. The Smithsonian Institution, 758 F.2d 591, 593 (11th Cir. 1985).  Thus, an FTCA claim must be dismissed if a plaintiff fails to file a timely administrative claim. See  United States v. Kubrick, 444 U.S. 111, 113 (1979).

Section 2401(b) "represents a deliberate balance struck by Congress whereby a limited waiver of sovereign immunity is conditioned upon the prompt presentation

14

of tort claims against the government." Gould v. U.S. Dept. of Health & Human Services, 905 F.2d 738, 742 (4th Cir. 1990)(citing Kubrick, 444 U.S. at 117); see also Phillips v. United States, 260 F.3d 1316, 1318 (11th Cir. 2001).   "Therefore, in construing the FTCA's statute of limitations, "'[the Court] should not take it upon [itself] to extend the waiver beyond that which Congress intended.'" Phillips, 260 F.3d at 1318 (citing Kubrick, 444 U.S. at 117-18).

### A.   Accrual of Claim

Generally, a tort claim brought pursuant to the FTCA accrues at the time of the plaintiff's injury. Kubrick, 444 U.S. at 120; Diaz v. United States, 165 F.3d 1337, 1339 (11th Cir. 1999).   "In certain situations, such as medical malpractice, the claim may accrue at a later date." Diaz, 165 F.3d at 1339; Price v. United States, 775 F.2d 1491, 1493 (11th Cir. 1985).   The FTCA statute of limitations period in medical malpractice actions "is tolled until the plaintiff possesses the critical facts of her injury and its cause." Price, 775 F.2d at 1493 (citing Kubrick, 444 U.S. at 122).   Restated, a medical malpractice claim under the FTCA acrues when the plaintiff (1) knows of the injury and (2) knows the cause of the injury, or, in the exercise of due diligence, should discover the cause of the injury. Kubrick, 444 U.S. at 122; Diaz, 165 F.3d at 1339; Burgess v. United States, 744 F.2d 771, 774 (11th Cir. 1984)("only knowledge of the cause and existence of an injury is required before the statute of limitations begins running in a FTCA claim").   "'[A] medical malpractice claim under the FTCA

accrues when the plaintiff is, or in the exercise of reasonable diligence should be,

aware of both her injury and its connection with some act of the defendant.'" <u>Diaz</u>,

165 F.3d at 1339 (citation omitted); <u>see also</u> <u>Chamness v. United States</u>, 835 F.2d

1350, 1352 (11th Cir. 1988)("[m]edical malpractice suits have been conditioned by the

exercise of due diligence by those injured").  Thus, once a plaintiff knows of the injury

and its probable cause, the plaintiff in the exercise of reasonable diligence  bears the

responsibility of inquiring further.  As stated by the Supreme Court in <u>Kubrick</u>, <u>supra</u>:

> A plaintiff . . . armed with the facts about the harm done to
> him, can protect himself by seeking advice in the medical
> and legal community.  To excuse him from promptly doing
> so by postponing the accrual of his claim would undermine
> the purpose of the limitations statute, which is to require the
> reasonably diligent presentation of tort claims against the
> Government.

<u>Kubrick</u>, 444 U.S. at 123.  "Further, the limitations period begins to run regardless of

whether plaintiffs make inquiries, and regardless of whether they are correctly

advised." <u>Gonzalez v. United States</u>, 284 F.3d 281, 289 (1st Cir. 2002)(citing <u>Kubrick</u>,

444 U.S. at 124).

        "The assessment of whether a plaintiff has acted reasonably is an objective one

and the conclusion varies with the facts of each particular case."  <u>Garza v. United</u>

<u>States Bureau of Prisons</u>, 284 F.3d 930, 935 (8th Cir. 2002).  "[I]n order to toll the

statute of limitations pursuant to the discovery rule, the factual basis for the cause of

action must have been 'inherently unknowable' at the time of injury. . . . The factual

16

basis for a cause of action is 'inherently unknowable' if it is 'incapable of detection by the wronged party through the exercise of reasonable diligence.'" Gonzalez, 284 F.3d at 288-89 (citation omitted).

**V.    Discussion**

The government cites to a number of decisions that hold that plaintiffs' claims alleging malpractice by government doctors were barred by the section 2401(b) two-year limitation period because the plaintiff did not act with sufficient dispatch upon learning of his or her injury and its cause.

In Price, supra, decided by the Eleventh Circuit, a naval officer and his wife who had lost a fetus as a result of an operation performed at a naval hospital, failed to file their administrative claim within two years of learning of their injury.  Though the plaintiffs learned of the loss within a few days after the government doctor performed a hysterectomy upon the wife, they waited nearly three years before consulting with an attorney or requesting medical records which established that a positive pregnancy test performed prior to the surgery had been erroneously reported as negative.  775 F.2d at 1494.  The court stated that "[o]nce the plaintiff discovers that her injury is probably attributable to some act of those who treated her, there is no longer any reason to toll the statute of limitations. . . .  If she intended to pursue the matter, there was no reason for her not to seek advice from others as to whether her treatment had been negligent, and whether she should bring a legal claim." Price, 775 F.2d at 1493-

17

94. The plaintiff's claim accrues when he or she "knows that her injury is connected to some act of those who treated her." Id. at 1493. "Thus, a medical malpractice claim under the FTCA accrues when the plaintiff is, or in the exercise of reasonable diligence should be, aware of both her injury and its connection with some act of the defendant." Id.

Defendant cites several cases in which the plaintiff received medical care from a public health facility, such as FMDC, not knowing that the facility and physicians were federally supported or federally employed. In Gould, 905 F.2d at 747, the court affirmed summary judgment for defendant government finding that plaintiff's cause of action against the government for medical malpractice accrued when the plaintiffs learned of both the existence and the cause of the decedent's injury, and not at the time plaintiff learned that one of the treating physicians was a federal employee. 905 F.3d at 740. "The burden is on the plaintiff to discover the employment status of the tort-feasor and to bring suit within the applicable limitations period." Id. at 745. Significantly, however, the Gould court held that plaintiff's' claim accrued "upon the death of [the decedent]" because plaintiffs "at this time were aware of the existence of the injury and its cause, including the identity and conduct of attending physicians. This sufficiently armed plaintiffs with the 'critical facts' to investigate the claim and present it within the two-year statute of limitations." Gould, 905 F.2d at 743.

Likewise, in Gonzalez, supra, the claim brought by the mother of a child with

18

various health problems against a federally supported health center and federally-employed doctors was dismissed for failure to file an administrative claim within the two-year limitation period.  The Court noted that by October 28, 1995, the day after the child's birth, the plaintiff was aware of difficulties with the delivery, and of the baby's health problems.  284 F.3d at 290.  The court found that the plaintiff's cause of action accrued by February or March, 1996, when she retained her first attorney and had obtained medical records, Gonzalez, 284 F.3d 286, 290, 293, but more than two years prior to May 1998 when plaintiff received the expert report that connected the baby's medical problems to her treatment at the time of birth, as plaintiff contended.  Id. at 290.  Further, the court concluded that the plaintiff demonstrated a clear lack of due diligence in determining that the doctors attending the birth of her baby were indeed federal employees in that no evidence was presented that she or her attorneys made any inquiry whatsoever as to their status.  284 F.3d at 291-92.

In Cotter v. United States, No. 1:06-CV-382, 2006 WL 3253289 (W.D. Mich. Nov. 8, 2006), the Court dismissed plaintiff's malpractice claim alleging negligent prenatal medical care by a family health center's physician because the plaintiff initiated her state lawsuit, not knowing that the physician was employed by the United States Public Health Service, and thus missed the section 2401(b) two-year limitations period.  In doing so, the court stated:

> [T]he fact that Plaintiff was not aware that the FHC was a
> federal employee does not extend the limitations period.  A

19

cause of action under the FTCA accrues once the existence of an injury and its cause are known. "The statute of limitation, under the FTCA commences to run from the date of accrual and does not wait until a plaintiff is aware that an alleged tortfeasor is a federal employer." <u>Gould v. U.S. Dept. of Health & Human Servs.</u>, 905 F.2d 738, 745 (4th Cir. 1990). "The burden is on plaintiffs to show that due diligence was exercised and that critical information, reasonable investigation notwithstanding, was undiscoverable." . . . <u>Id</u>. at 745-46.

<u>Cotter</u>, 2006 WL 3253289, at * 5; <u>see also</u> <u>Ingram v. United States (In re T.L.)</u>, 443 F.3d 956, 962-65 (8th Cir. 2006)(plaintiff, a 15-year old mother alleging malpractice against federally employed doctor who attended the birth of her baby, had duty under the law to seek advice about possible legal action at the time she knew of baby's brain injury, not only after the full effects of the brain damage was manifested); <u>Kelly v. Total Health Care, Inc.</u>, No. CIV. JFM-99-2433, 2000 WL 151280 (D. Md. Jan. 28, 2000)(plaintiff's malpractice claim regarding deceased daughter barred despite fact that health center took no action to publicize that it was federally supported; "absent active concealment, a plaintiff's ignorance of a person's status as a federal employee does not excuse plaintiff's failure to file a timely administrative claim").

The underlying rule is that "the statute of limitations under the FTCA 'does not wait until a plaintiff is aware that an alleged tort-feasor is a federal employee.' . . . Where the government or its agents have not misled or deceived a plaintiff, or otherwise hidden the legal identity of alleged tortfeasors as federal employees, the cause of action still accrues when the existence of an injury and its cause are known."

Garza v. United States Bureau of Prisons, 284 F.3d 930, 935 (8th Cir. 2002)(quoting Gould, 905 F.2d at 745).  "Once a plaintiff is aware of the facts of the harm done to her, she has a duty to exercise due diligence in investigating its cause, and '[w]hether the advice received is competent or incompetent makes no difference to the accrual of [her] claim.'" Ingram, 443 F.3d at 963. (citation omitted).

The cases cited by defendant have similar facts as those here where the plaintiffs knew about their injury and knew the doctor-cause of the injury, but did not know that the potential tortfeasor was employed by the federal government. However, this failure to discover the known tortfeasor's federal status did not delay the accrual of the claim for limitations purposes.

Plaintiff cites Drazan v. United States, 762 F.2d 56 (7th Cir. 1985), in which a widow brought a wrongful death claim under the FTCA based on alleged malpractice at a Veteran's Administration Hospital which occurred when the hospital, which had been regularly screening her husband's lungs for tuberculosis, failed to follow-up on an annual lung x-ray made in December 1979 which revealed a suspicious but small tumor.  The tumor was next seen 13 months later at his next annual check-up and was by then, large in size.  The husband died of lung cancer the following month, February 1981.  The widow requested and received her husband's medical records 10 months later in December 1981, and the medical records revealed the missed follow-up exam.   Id. at 57-58.

The <u>Drazan</u> court held that "[w]hen there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute of limitations running is knowledge of the government cause, not just of the other cause." <u>Id</u>. at 59; <u>see also</u> <u>Diaz</u>, 165 F.3d at 1340.  Rejecting the government's contention that the widow's FTCA cause of action accrued when her husband died of lung cancer in February 1981, the <u>Drazan</u> court held that the limitations period "begins to run either when the government cause is known or when a reasonably diligent person (in the tort claimant's position) reacting to any suspicious circumstances of which he might have been aware would have discovered the government cause - whichever comes first." <u>Drazan</u>, 762 F.2d at 59.  Thus, the court determined that the husband's death did not automatically put the widow on notice that his illness was caused by alleged "iatrogenic" (doctor-caused) negligence by the government the prior year.

Jones argues that under the <u>Drazan</u> standard, her claim did not accrue until November 1, 2004, when her counsel received Dr. Kalmadi's response disclosing his status as a federal employee.  (Doc. 20 at 9.)  However, <u>Drazan</u> is distinguishable. The accrual issue in <u>Drazan</u> (and <u>Diaz</u> in which the Eleventh Circuit adopted the reasoning of <u>Drazan</u>) was tied to the plaintiff's discovery of potential medical negligence (ie. "iatrogenic harm"), not to the different question of plaintiff's discovery of whether the doctor causing the harm was employed by the federal government. Thus, while the language in <u>Drazan</u> and <u>Diaz</u> that the plaintiff's claim does not accrue

22

until she has "knowledge of the government cause," and has "discovered the government link in the causal chain," see Diaz, 175 F.3d at 1340; Drazan, 762 F.2d at 59, at first blush might appear to support plaintiff's argument that her claim did not accrue until she learned that Dr. Kalmadi was federally employed, when viewed in proper context, these cases do not help plaintiff.  Indeed, Drazan reaffirms that a FTCA claim accrues upon knowledge of injury together with knowledge that the harm might have been iatrogenic.  Drazan, 762 F.2d at 59.

### A.    Accrual of Jones' Claim

Because Jones filed her administrative claim on January 26, 2005, she acknowledges that her claim must have accrued *after* January 26, 2003, or her claim will be time-barred.  Even resolving all reasonable doubts in favor of Jones, it is undisputed that by October 2, 2002, Jones definitively knew that B.L. had contracted the Hepatitis B virus, and that B.L.'s illness allegedly was caused by the attending physicians' failure to properly innoculate B.L. at the time of his birth.[11]  Armed with

---

[11]    The key dates are as follows:

| | |
|---|---|
| 11/21/01 | B.L. born |
| 01/03/02 | Jones is told that B.L. was not inoculated for Hepatitis B |
| 05/30/02 | Jones asks case worker for a referral to an attorney to pursue litigation against the hospital |
| 08/30/02 | Jones is told that B.L. had a reactive response to a Hepatitis B blood test |
| 10/02/02 | Jones advised that CDC test results confirm that B.L. has Hepatitis B |

knowledge of the injury and its purported cause, Jones' knew she had a potential legal claim against the hospital and the treating physicians, and had enough critical information with which to investigate the details.  The Court rejects plaintiff's argument that Jones' claim did not accrue until she knew of B.L.'s injury, its probable cause, *and* that the federal government was involved, as being contrary to the law, and finds that Jones' claim accrued on October 2, 2002 for FTCA statute of limitations purposes when "[k]nowledge of the injury and its cause should [have] stimulate[d] inquiry," and a reasonably diligent person reacting to the "suspicious circumstances . . . would have discovered the government cause." <u>Drazan</u>, 762 F.2d at 58-59 (adopted by <u>Diaz</u>, 165

| | |
|---|---|
| 11/21/02 | Jones meets with attorney Sidney Nowell |
| 01/21/03 | Jones obtains hospital medical records containing Dr. Kalmadi's name and mails records to attorney Nowell |
| 10/06/04 | Jones mails PCMC and Drs. Akhiyat and Kalmadi notice of pre-suit pursuant to Florida Statutes. |
| 11/01/04 | Dr. Kalmadi mails Jones notification  that at the time of B.L.'s birth he was a federal employee subject to the FTCA |
| 11/06/04 | Jones mails FMDC notice of pre-suit pursuant to Florida Statutes |
| 12/23/04 | U.S. Dept. of Health and Human Services notifies Jones that FMDC is a federally supported health center |
| 01/26/05 | Jones files administrative claim, dated 1/19/05, with the U.S. Dept. of Health and Human Services |
| 07/11/05 | U.S. Dept. of Health and Huuman Services denies Jones' claim as time-barred |
| 11/09/05 | Jones files Complaint in this action |

F.3d at 1340).  See also e.g., Price, 775 F.3d at 1493 (plaintiff's claim accrues when she "knows that her injury is connected to some act of those who treated her"); Burgess, 744 F.2d at 774 (only knowledge of injury and its cause is required to begin the FTCA statute of limitations running).  Plaintiff knew of the potential doctor-caused negligence shortly after B.L.'s birth, and of the child's Hepatitis B diagnosis by October 2, 2002.  The two requirements for accrual of an FTCA medical malpractice claim were satisfied on that date.  That plaintiff did not also know of the federal employment of one of the attending physicians whose potential negligence caused B.L.'s injury, does not negate the accrual of her claim on that date.  See cases cited supra pp. 17-21.

From that point on, Jones had two years (or until October 2, 2004) within which to discover the identity of the attending physicians, as well as the physicians' employers, and to file an administrative claim with the United States Department of Health and Human Services.  Medical records, which revealed Dr. Kalmadi's name at least eighteen (18) times were in Jones' and her attorney's hands by January 21, 2003 or shortly thereafter.  Indeed, her second attorney, Mr. McLeod, who sent the state notice of pre-suit, was able to determine from the records that Dr. Kalmadi and FMDC were potential defendants, nullifying plaintiff's argument that she was unaware that Dr. Kalmadi treated B.L. in the hospital.  (See Doc. 20 at 2 (plaintiff's memorandum)("[t]he medical records indicate the government's agent, Dr. Kalmadi,

received the child into his care on [November 21, 2001]").[12]  Once she knew of her

injury and its probable cause, Jones was armed with the critical facts to investigate

the claim - which means discerning potential defendants <u>and</u> the employer of the

alleged tortfeasors - and present it within the two-year statute of limitations.  The

accrual of Jones' claim did not wait until November 1, 2004, when she received Dr.

Kalmadi's letter making her aware that the FMDC was federally funded and that Dr.

Kalmadi was a federal employee and could be sued only pursuant to the FTCA.

Furthermore, Jones fails to explain the nearly 20-month period of delay and

inactivity between January 21, 2003, when she received the medical records with Dr.

Kalmadi's name clearly displayed, and October 6, 2004 when Jones' successor

attorney mailed Dr. Kalmadi a notice of pre-suit.  That this delay appears to largely be

---

[12]    At oral argument, counsel for Jones argued that Jones could not reasonably be
on notice - even with the medical records in hand - that Dr.Kalmadi, whose signature
is illegible, saw B.L. within the first 12 hours of the infant's life, the critical time period
for the required inoculation.  The Court finds to the contrary.  Many of the medical
records are repeatedly type-stamped with Dr. Kalmadi's name, putting plaintiff on
notice to inquire into Dr. Kalmadi's role in B.L.'s care.  (Doc. 25-13.)  Further, The
PCMC Admission Sheet for newborn B.L. states in typewritten print that B.L. was born
on November 21, 2001 at "1350" (1:50 p.m.), and that the "Attending Physician" the
"Prim Care Physician" and the "Admitting Physician" was all "Kalmadi, Sujith R."  This
document, part of the hospital records provided to plaintiff in January 2003, which on
its face confirms Dr. Kalmadi's early involvement, was provided to the Court by the
government as a courtesy copy attachment to Dr. Kalmadi's affidavit, (Doc. 25-13),
but it is not included in the electronically filed documents accompanying the affidavit.
However, the Court assumes this is an oversight and has no reason to doubt the
authenticity of the Admission Sheet.  The Clerk is directed to file the Admission Sheet
as an attachment to Dr. Kalmadi's affidavit.

the responsibility of Jones' previous attorney is unfortunate and troubling, but provides no basis to avoid the time bar.

## B. Equitable Tolling

While the Court is sympathetic to Jones' predicament, it is unable to invoke "equitable tolling" to relieve her of the requirements of the FTCA statute of limitations. "'Equitable tolling is appropriate when a movant untimely files because of *extraordinary circumstances* that are both beyond his control and unavoidable even with diligence.'" Arce v. Garcia, 434 F.3d 1254, 1261 (11th Cir. 2006)(emphasis in original)(citation omitted). In the FTCA context, "[t]he doctrine of equitable tolling suspends the running of the statute of limitations if a plaintiff in the exercise of reasonable diligence, could not have discovered information essential to the suit." Gonzalez, 284 F.3d at 291. The burden of proving entitlement to equitable tolling rests with the plaintiff. See Valdez v. United States, 415 F. Supp.2d 345, 350 (S.D. N.Y. 2006).

In Ingram, supra, with facts similar to those here, the court rejected the plaintiff's request that the FTCA two-year statute of limitations be equitably tolled. Plaintiff, a 15-year old mother, argued that because she had delivered her brain damaged baby at a private hospital, she had no reason to suspect that her baby was delivered by an employee of a federally funded health clinic, and that the medical records made no indication of the federal connection. Ingram, 443 F.3d at 963-64.

The court held that the doctrine of "equitable tolling" did not apply to "'garden variety'" claims of excusable neglect," and that the case did not present sufficient "exceptional circumstances." The factors considered by the court were that plaintiff mother was responsible for the baby's well-being; she knew of the baby's brain damage shortly after the birth; and that the mother's family had hired an attorney six days after the birth of the baby. Id., 443 F.3d at 964-655. See also Motley v. United States, 295 F.3d 820, 824 (8th Cir. 2002)(declining equitable tolling of the two-year limitation period because "plaintiffs were not affirmatively misled by [the health center] or the government - they simply made no inquiry into [health center's] status" during the two-year period after the claim accrued); Gonzalez, 284 F.3d at 291 (rejecting plaintiff's plea for equitable tolling of section 2401(b) time limits when she and her attorneys failed to make inquiry as to the employment status of the doctors against whom she eventually brought a malpractice claim); Martinez v. United States, No. CIVA 06CV01497 PSFPA, 2006 WL 3746708 at * 7 (D. Col. Dec. 18, 2006)(even if plaintiffs did not have reason to know defendant doctors who provided prenatal care and performed delivery at regional medical center were covered by the FTCA, "that is not a good reason to equitably extend the limitations period of the FTCA"). "To toll the statute because of a plaintiff's ignorance of the defendant's federal employee status, plaintiff 'must at the very least show that the information *could not* have been found by a timely diligent inquiry . . . .'" Motley, 295 F.3d at 824 (quoting Gonzalez, 284

28

F.3d at 291)).

Plaintiff is an indigent single mother working to raise five children.  She has been dealing with issues relating to money, child support, housing, problems in her neighborhood, worries about eviction, mental health counseling, appropriate school placement for her children, child care, transportation, domestic violence, and the death of a child.  In the midst of this trying life, Jones, under the law, was required to navigate the complicated legal requirements of the FTCA and file an administrative claim within two years of learning of her baby's injury and its probable cause.  During the more than more than three years between B.L.'s birth and the filing of her administrative claim on January 26, 2005, Jones was counseled and advised by two attorneys, at least two case workers, and B.L.'s pediatrician.  Despite this team of professionals, Jones administrative claim was filed three and a half months too late.[13] The inactivity on Jones' case between January 2003 and October 2004, during which time she was represented by predecessor counsel, is difficult to understand.  Jones and her son deserved better.  Nevertheless, under controlling law, the Court cannot find equitable tolling.

---

[13]  Jones' current counsel, Robert McLeod, came into this case right at the end of the limitations period and has valiantly fought to save plaintiff's federal claim.  The Court appreciates Mr. McLeod's service.

For the foregoing reasons, and upon due consideration, it is hereby

**ORDERED:**

1.    Plaintiff's Motion For Partial Summary Judgment (Doc. 20) is **DENIED**.

2.    Defendant United States' Dispositive Motion For Summary Judgment (Doc. 27), which the Court treats as a motion to dismiss for lack of subject-matter jurisdiction, Fed. R. Civ. P. 12(b)(1), is **GRANTED.**

3.    The Clerk shall enter judgment in favor of defendant United States of America, and against plaintiff Cynthia Jones, as natural mother and guardian of B.L., a minor, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 21st day of December, 2007.

TIMOTHY J. CORRIGAN
United States District Judge

jl.
Copies to:
Counsel of Record